**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MARCIA HUFFMAN, )
Individually and on behalf of C.H., a minor, )
)
Plaintiff, )
)
v. ) Case No. 08-2083-KGS
)
NORTH LYON COUNTY SCHOOL DISTRICT )
and FLINT HILLS SPECIAL )
EDUCATION COOPERATIVE, )
)
Defendants. )

**MEMORANDUM AND ORDER**

This matter comes before the court upon Plaintiff's Motion for Judgment on the Pleadings and Suggestions in Support (Doc. 14) and Defendants' Memorandum in Opposition to Plaintiffs' [sic] Motion for Default Judgment on the Pleadings and Cross-Motion for Judgment on the Administrative Record (Doc. 16). For reasons explained more fully below, plaintiff's motion is denied, and defendants' motion is granted.

This is an action brought under the Individuals with Disabilities in Education Act (IDEA). The IDEA is a federal spending statute that requires states accepting federal special education funds to provide children with disabilities with a free, appropriate public education (FAPE) in the least restrictive environment (LRE).[1] To accomplish this, the state must create an individualized education program (IEP) for each student with a disability.[2] The present action is a determination

---

[1] *Ellenberg v. New Mexico Military Inst.*, 478 F.3d 1262, 1267 (10th Cir. 2007).

[2] *Id.* at 1268 (citing 20 U.S.C. § 1412).

based on the administrative record.[3] The district court engages in a modified *de novo* review of challenges to administrative adjudications under the IDEA.[4] This requires the district court to (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of the evidence.[5] Although the statute specifies that review is *de novo*, "the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean 'due weight' must be given to the administrative proceedings, the fact findings of which are 'considered *prima facie* correct.'"[6] "Because the IDEA requires a district court to grant judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issue of material fact.'"[7] Accordingly, the following facts from the administrative proceeding, which are considered *prima facie* correct, find substantial support in the record.

## I. Factual Findings

C.H. is a child with autism and other attendant disabilities who qualified to receive special education and related services under the IDEA during the time he was enrolled as a student in the

---

[3] *See, e.g., MM ex rel. Moore v. Unified Sch. Dist. No. 368,* No. 07-2291-JTM , 2008 WL 4950987, at *9-10 (D. Kan. Nov. 18, 2008) (noting that even though one of the parties had filed what was titled a summary judgment motion, the resolution of this type of case "is not summary judgment, but rather a determination based on the administrative record") (citing *L.C. v. Utah State Bd. Of Educ.*, 125 Fed. Appx. 252, 255 (10th Cir. 2005)).

[4] 20 U.S.C. § 1415(i)(2)(C); *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (citing *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 116, 1125)).

[5] 20 U.S.C. § 1415(i)(2)(C); *Thompson*, 540 F.3d at 1149.

[6] *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176 (1982) and *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 996, 974 (10th Cir. 2004)).

[7] *Ellenberg*, 478 F.3d at 1274 (citing *Nebo*, 379 F.3d at 973-74.

North Lyon County School District (the district). C.H. attended Admire Grade School from the time he was in kindergarten until November 2006, when his parents placed him in a private school. During the time C.H. attended school in the district, Flint Hills Special Education Cooperative (the cooperative) provided special education services. On October 5, 2006, plaintiff filed an administrative due process complaint alleging procedural and substantive violations of the IDEA and seeking reimbursement for the costs associated with placing C.H. in private school.

The alleged violations that are the subject of the hearing officer's decision occurred during the 2004-2005 school year, the 2005-2006 school year, and the beginning of the 2006-2007 school year. C.H. began the 2004 school year with an IEP in place. In October of that year, the IEP team met to review C.H.'s IEP and to develop a new IEP. The IEP team consisted of several teachers, including a special education teacher, C.H.'s occupational therapist, the principal of the school, a speech and language pathologist, and C.H.'s mother. At the meeting, a decision was made to reduce C.H.'s occupational therapy services, but C.H.'s mother opposed the reduction. Additionally, C.H.'s occupational therapist had expressed concerns that C.H. was having difficulty using cursive handwriting and recommended a keyboarding program to increase C.H.'s efficiency and ability to communicate. As a compromise, the team decided to reduce C.H.'s occupational therapy to one session per week for nine weeks and then to a consultation-only basis whereby C.H.'s paraprofessional would consult with the occupational therapist about appropriate activities for C.H.

C.H.'s mother refused to consent to the reduction in occupational therapy services and spoke to Elizabeth McCoy, the director of the cooperative, in December of 2004 about her concerns regarding the reduction of C.H.'s occupational therapy and the discontinuation of services from Janet McAfee, an autism consultant. C.H.'s mother requested that an autism consultant or specialist

assist in providing services to C.H. In response, Ms. McCoy suggested the IEP team be reconvened to address these issues. Around this time, C.H.'s mother expressed to Ms. McCoy her desire for C.H. to continue working on communication skills, social skills, money-related skills, personal care needs, making friends, and issues relating to sensitization to food. Ms. McCoy responded by stating she would speak with the principal and a team leader employed by the cooperative with a background in counseling and who had attended a series of seminars related to autism. These individuals would begin drafting a new plan for C.H. in order to lay the foundation to reconvene the IEP team. In suggesting changing C.H.'s IEP to adopt a more "functional" approach focusing on life skills, Ms. McCoy reviewed C.H.'s results from the Iowa Test of Basic Skills and the results from Kansas State Assessments. She apparently made her recommendation without reference to other information.

The IEP team reconvened on March 8, 2005, and rewrote C.H.'s goals. During the meeting, the team considered C.H.'s strengths and weaknesses. The team reviewed the existing data, including a "Short Sensory Profile" of C.H., which indicated that C.H. required assistance with clothing management and social skills and stated that C.H. had several sensory issues. The team included in the IEP a goal concerning independence with clothing management and personal care awareness. In response to observations of C.H.'s difficulties understanding others' emotions, the team developed a goal that C.H. would begin to initiate conversations and initiate greeting other students and teachers. The team also included a benchmark of being able to produce personal information to appropriate people when asked. Because the team observed that C.H. had difficulty understanding money and the way different coins could be combined to create the same amount, the team developed a goal to address proper use of the dollar symbol and decimal point in addition to

C.H. being able to identify the comparative value of coins and compute the cost of items. Other goals included C.H. being able to: write his full address, home phone number, and a parent's work number; complete a grocery list; write a four-sentence to five-sentence letter using proper grammar, capitalization, and punctuation. The team developed another goal aimed at improving C.H.'s functional reading skills, which included: reading safety signs and understanding their purpose; using a phone book to locate a given name, restaurant, or other business; and reading and following directions. The team also noted C.H.'s strengths, such as friends in the classroom and at his school and his ability to carry on a conversation as long as another person initiated it. In the area of academic performance, the team noted C.H. was working well with one-on-one assistance. The IEP team decided speech services twice a week would continue, and C.H. would receive occupational therapy once a week.

By May, C.H.'s progress report shows that C.H. was working toward meeting some of his IEP goals. He was using dollar symbols and decimal points ninety-eight percent of the time, and when he failed to use the symbol or decimal, he would correct his mistake when asked what was missing. He knew his address but would leave off the highway number or the box number. Also by this time, C.H. could give the purpose of safety and warning signs with eighty percent accuracy. He was working on interactions with people but had not become comfortable initiating greetings. He could button and unbutton four large buttons in thirty seconds, fasten and zip his coat in three out of five attempts, and he was able to tie his shoes with minimal assistance. The notes from C.H.'s occupational therapist also reflect progress. C.H. served lunch at the school with some assistance, but he had an aversion to peaches and peas. However, the September 2005 notes reflect improvement in this area, as C.H. had begun to serve peaches without assistance.

Lee Stickle, the co-director of the Kansas Instruction Support Network, observed C.H. for four hours on September 13, 2005, at the request of C.H.'s special education teacher. Ms. Stickle compiled a summary of her observations and made suggestions to the special education teacher. Among other observations, Ms. Stickle noticed C.H. struggled with tasks requiring writing. She recommended the use of assistive technology, examples of which are keyboarding or word prediction software. C.H. was instructed in keyboarding and was given word prediction software. Ms. Stickle noted C.H. had difficulty transferring between activities and stated that the Toy Shoppe program would help autistic students learn to transition from task to task or learn to transition after competing a sequence of tasks. Toy Shoppe is a program through which special education students fix broken toys. Ms. Stickle testified at the due process hearing that she did not see any reason why C.H.'s educational program would have required substantial changes.

C.H.'s January 2006 progress report also shows C.H. continued working toward his IEP goals. He had completed the goal of computing the cost of several items with a ninety-five percent accuracy rate. The report reflects he was learning division. He also completed a goal of making a list of items and ingredients to be purchased for making a simple recipe such as brownies while leaving off fewer than four items. C.H. could read and follow directions with eighty percent accuracy. He could alphabetize to the second letter with no errors but struggled with alphabetizing to the third letter, and therefore, this goal was continued. C.H. began initiating conversations with peers and adults and could share personal information when requested, thus showing progress on another goal. The report also shows progress on the goal of clothing management and personal care awareness. C.H. could now fasten and zip his coat as many times as asked, meeting the buttoning benchmark nine weeks early. C.H.'s occupational therapist noted that C.H. could tie a shoe with

only one verbal prompt and noted he was demonstrating more self-confidence.

Three months after Ms. Stickle evaluated C.H., the IEP team met again. C.H.'s principal testified at the due process hearing that the team considered adopting a more functional curriculum because C.H.'s mother was concerned his previous IEP was not meeting his needs. The principal testified the team's response was to rewrite the IEP in order to address these concerns. Prior to the meeting, C.H.'s teachers, paraprofessional, speech and language pathologist, and occupational therapy paraprofessional prepared a school function assessment for consideration. The IEP team also considered C.H.'s results from the fall 2006 Iowa Test of Basic Skills and the results from the March 2005 Gray Oral Reading Test. The IEP team considered it a possibility that C.H. would begin participating in the Toy Shoppe program, and they discussed issues arising during lunch. Specifically, C.H. would not eat his food when sitting with peers. C.H's mother was concerned with maintaining C.H.'s social interaction with other students, and so the IEP team determined C.H. should begin eating lunch in the resource room before the regular lunch period started in order to ensure C.H. ate his food before joining his peers in the lunch room.

Throughout the time C.H. was a student in the school district, the district and cooperative educators and officials engaged in conversations with C.H.'s mother regarding her concerns and C.H.'s progress and challenges. C.H.'s principal testified that educators and therapists listened to C.H.'s mother's concerns and attempted to address the issues she raised. During C.H.'s time at Admire Grade School, he performed well on several standardized tests that were modified to include fewer answer selections. He also showed improvement on multiple IEP goals, and educators and therapists observed improvement in other areas, too. Despite what appears to be frequent communication between plaintiff and defendants' employees, C.H.'s mother believes defendants

failed to complete appropriate evaluations of C.H., and she contends the IEP team consisted of individuals who lacked appropriate training on autism. C.H.'s mother argues that these conditions rendered her unable to adequately participate in developing C.H.'s IEPs. Feeling that C.H.'s progress while enrolled in the school district was minimal to nonexistent, C.H.'s mother provided the school district with written notice that she intended to enroll C.H. at Boston Higashi School, an educational institution for autistic children, and she filed a due process complaint seeking reimbursement for private school tuition. After the hearing officer rendered a decision in favor of defendants on October 27, 2007, plaintiff appealed the decision to an administrative reviewing officer. On January 22, 2008, the special education due process reviewing officer affirmed the hearing officer's decision and denied plaintiff's request for reversal. Plaintiff subsequently commenced this action.

## II. Subject Matter Jurisdiction

Defendants' cross-motion for judgment on the administrative record argues that this court lacks subject matter jurisdiction, and therefore, plaintiff's complaint should be dismissed. Because the court should always satisfy itself of jurisdiction before turning to the merits of a claim, the undersigned first addresses defendants' argument that this court lacks jurisdiction before turning to the issue of whether defendants violated the IDEA.[8]

Kansas employs a two-tiered approach whereby parents can challenge school district decisions regarding the education of their children. First, the IDEA provides parents with an opportunity for an impartial due process hearing conducted by either the State or local educational

[8] *Cudjoe v. Indep. Sch. Dist. No. 12,* 297 F.3d 1058, 1063 (10th Cir. 2002) (stating that a court should satisfy itself of jurisdiction before proceeding to the merits).

agency.[9] When the hearing is conducted by a local educational agency, as is the case in Kansas,[10] the aggrieved party may appeal the decision to the State educational agency.[11] The State educational agency conducts an impartial review of the local agency's findings and decision and renders an independent decision.[12] When the due process hearing is conducted by a State educational agency, or a decision by a local agency has been appealed to a State agency, an aggrieved party may commence a civil action.[13]

Although plaintiff appealed the hearing officer's decision to the State educational agency, her brief in this civil action alleges error with only the hearing officer's decision. Specifically, plaintiff argues that the hearing officer erred (1) by deciding that the education provided to C.H. met the standard of "appropriate," as established by case law and (2) by finding that the private placement utilized by plaintiff was not appropriate. Defendants contend that plaintiff failed to raise these arguments before the reviewing officer. They argue that the reviewing officer's decision constitutes the final administrative record for review and that because plaintiff alleges error with the hearing officer's decision, plaintiff has failed to exhaust her administrative remedies as to these issues. Because of this, defendants contend this court lacks subject matter jurisdiction.

It is well settled that a plaintiff's failure to exhaust her administrative remedies almost

---

[9] *See generally* 20 U.S.C. § 1415(f).

[10] K.S.A. 72-974(b)(1) ("Any party to a due process hearing under this act may appeal the decision to the state board by filing a written notice of appeal . . . ").

[11] 20 U.S.C. § 1415(g)(1).

[12] 20 U.S.C. § 1415(g)(2).

[13] 20 U.S.C. § 1415(i)(2).

always deprives the court of subject matter jurisdiction over IDEA claims.[14] In fact, defendants cite several cases in support of this proposition. Nevertheless, all of these cases are factually distinguishable from the present matter. For example, in *Polera v. Board of Education of the Newburgh Enlarged City School District*, the plaintiff filed a complaint in federal district court without participating in the administrative process.[15] In *Vultaggio v. Board of Education*, the plaintiffs participated in the administrative process and prevailed on certain issues, but the decision of the state agency did not wholly dispose of all of plaintiffs' claims.[16] Specifically, the state agency did not reach the issue of whether placement in an arts program would be appropriate for the student. Instead, the state agency would wait for the development of a new IEP, an indication that the administrative decision "specifically contemplates further action at the local level."[17] Therefore, the court found plaintiffs had failed to exhaust their administrative remedies as to this issue and noted that plaintiffs had requested and taken part in a due process hearing during the course of the district court action, making it "particularly inappropriate to entertain a civil action at this time."[18]

Unlike the plaintiff in *Polera*, the plaintiff in this case participated in the administrative process and properly sought review from the State agency. The central issue before the hearing officer and the reviewing officer was whether plaintiff's son was denied a free, appropriate public education, also the central issue before this court. The court reads the decisions by the hearing

---

[14] *See, e.g., Ellenberg*, 478 F.3d at 1275-76 ("[P]laintiffs are required to utilize the elaborate administrative scheme established by the Act before resorting to the courts to challenge the actions of the local school authorities") (quoting *Hayes ex rel. Hayes v. USD No. 377*, 877 F.2d 809, 814 (10th Cir. 1989)).

[15] *Polera v. Bd. of Educ. Of the Newburgh City Sch. Dist.*, 288 F.3d 478 (2d Cir. 2002).

[16] *Vultaggio v. Bd. of Educ.*, 216 F. Supp. 2d 96, 106 (E.D.N.Y. 2007)

[17] *Id.* at 107.

[18] *Id.*

officer and reviewing officer as reaching that issue, and thus, unlike *Vultaggio*, there is nothing more to be done at the administrative level.

At most, it appears defendants are unsuccessfully attempting to assert a waiver argument: that plaintiff failed to raise certain issues before the reviewing officer and is therefore barred from raising these issues in this civil action. Broadly read, the court interprets plaintiff's brief to the reviewing officer as encompassing the argument, albeit indirectly, that the hearing officer erred by deciding that the education provided to C.H. met the standard of "appropriate," as established by case law. For example, in plaintiff's review brief she argues that the hearing officer "erroneously cites [*Board of Education v.*] *Rowley* . . . when [this decision] actually interpreted the IDEA's predecessor statute only."[19] She goes on to generally allege error with several of the hearing officer's findings. These general arguments are substantially similar to the arguments she raises in her brief to this court.

Furthermore, the court is not convinced that a plaintiff's failure to raise certain arguments in front of a reviewing officer deprives the court of subject matter jurisdiction. For one, the IDEA requires the reviewing officer to conduct an impartial review of the hearing officer's findings and decision and then render an independent decision upon completion of such review.[20] Because the reviewing officer must render an impartial decision based on the entirety of the hearing officer's opinion, he would not necessarily be limited to addressing the parties' arguments. Similarly, this court is also required to conduct a modified *de novo* review of the administrative decision. As

[19] Review Brief at p. 1. The court need not address whether plaintiff raised the second issue before the reviewing officer because, for reasons explained more fully below, plaintiff cannot prevail on the first issue. In other words, reimbursement is not available for plaintiff because she cannot show a violation of the IDEA, and therefore the court need not consider whether Boston Higashi School constituted an appropriate private placement for C.H.

[20] 20 U.S.C. § 1415(g)(2).

plaintiff suggests, the court is not necessarily limited to errors discussed in plaintiff's motion. However, the court would expect that an attorney, as a zealous advocate for her client, would provide a clear description of the alleged violations of the IDEA along with a comprehensive list of points of error from the administrative proceedings, both of which are lacking in this case.

Although the court is unclear as to why plaintiff has failed to allege error with the reviewing officer's decision, this alone does not deprive the court of subject matter jurisdiction.[21] Plaintiff has exhausted her administrative remedies by seeking review of the hearing officer's decision, and she alleges violations of the IDEA that were previously considered during the administrative proceedings In sum, plaintiff's due process complaint has been resolved through the administrative process, and there is simply nothing more to be done at the administrative level.[22] Though defendants indirectly advocate that because the reviewing officer's report constitutes the final administrative record for review, the court should somehow ignore the hearing officer's report, this contention is without merit. The IDEA requires the court to receive and review the entire administrative record.[23] Presumably, defendants were aware that the hearing officer's report constituted part of the administrative record because defendants produced this report along with the transcript from the proceeding before the hearing officer and documents presented to the hearing

---

[21] *See generally*, *Moore v. Unified Sch. Dist. No, 368*, No. 07-2291-JTM, 2008 WL 4950987 (D. Kan. 2008) (finding that a *hearing officer's decision* was supported by a preponderance of the evidence and not specifically addressing the reviewing officer's decision).

[22] *Compare with McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868 (10th Cir. 2007) (finding that plaintiffs had failed to exhaust their administrative remedies when they appealed an administrative decision when the hearing officer had bifurcated the due process proceeding and remainder of plaintiffs' due process complaint had not been resolved).

[23] 20 U.S.C. § 1415(i)(2)(C); *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995) (stating that the district court must "independently review the evidence contained in the administrative record . . . and make a decision based on a preponderance of the evidence").

officer. Although the Tenth Circuit has not directly addressed this issue, it has made it clear that the court considers proceedings before the hearing officer as well as the hearing officer's report as part of the administrative record.[24] For these reasons, the court finds subject matter jurisdiction is proper and turns to the issue of whether defendants violated the IDEA.

**III. Alleged Violations of the IDEA**

As previously alluded to when discussing jurisdiction, the manner in which plaintiff's counsel has elected to plead plaintiff's case to the hearing officer, reviewing officer, and to this court has complicated the court's task of determining how plaintiff contends defendants have violated the IDEA. For example, plaintiff's due process complaint contains a boilerplate checklist of provisions of the IDEA with sixty-four checkmarks in boxes next to certain statutory provisions that plaintiffs contend defendants violated.[25] After defendants moved to dismiss plaintiff's due process complaint for lack of specificity, the hearing officer allowed plaintiff to amend her complaint to include more factual allegations.[26] It appears a number of alleged violations contained in the original due process complaint were not fully developed during the due process hearing or were eventually abandoned, as they were not mentioned in plaintiff's post-hearing brief to the hearing officer or in the hearing officer's decision.[27] Plaintiff's brief to the reviewing officer also suffers from a lack of specificity.

---

[24] *See, e.g., O'Toole v. Olathe Sch. Dist. USD No. 233*, 144 F.3d 692, 699 (10th Cir. 1998) (stating that the district court should give due weight to the hearing officer's decision on issues of credibility even if the reviewing officer disagreed with the hearing officer's determination on those issues).

[25] Plaintiff's Due Process Hearing Request and Complaint Notice.

[26] Hearing Officer's Pre-Hearing Status Conference Order. The hearing officer also provided plaintiff with two more opportunities to provide additional factual allegations to support the alleged violations.

[27] Plaintiff does not contend the hearing officer erred by failing to address an alleged procedural or substantive violation. Indeed, the hearing officer's decision addresses each alleged violation raised in plaintiff's post-hearing brief.

The brief contains thirteen numbered paragraphs, which the reviewing officer characterized as a summary of plaintiff's view of the case rather than a statement of points of reversible error supported by citation to the record and a clear statement of the law that the hearing officer did not properly follow.[28] Likewise, in plaintiff's complaint and in her cross-motion for judgment on the administrative record, she generally alleges multiple errors with the hearing officer's decision; however, she fails to allege with any particularity how defendants violated the IDEA, and save for plaintiff's argument that the hearing officer incorrectly applied *Rowley*, plaintiff's brief provides little information as to how, even if the hearing officer had not committed these alleged errors, the weight of the evidence would still show defendants violated the IDEA.[29]

Plaintiff seeks reimbursement for costs and expenses associated with placing C.H. in the Boston Higashi School, a private institution, as well as attorney fees and costs incurred. To obtain reimbursement for private tuition, plaintiff must show, at a minimum, that the school district violated the IDEA and that the education provided by the private institution is reasonably calculated to enable the student to receive educational benefits.[30] A school district violates the IDEA when a student is not provided with a free, appropriate public education (FAPE) in the least restrictive environment (LRE).[31] The court also considers procedural violations of the IDEA.[32] However, not

---

[28] Reviewing Officer's Report (Jan. 22, 2008) at p. 2.

[29] The court also notes that multiple paragraphs of plaintiff's brief to this court also appear verbatim in plaintiff's post-trial brief to the hearing officer.

[30] *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1148 (citing citing *Nebo*, 379 F.3d at 978 and 20 U.S.C. § 1412(a)(10)(C)(ii)).

[31] *Id.* (citing *Nebo*, 379 F.3d at 975 n.13 and 20 U.S.C. § 1412(a)(5)).

[32] *Id.* at 1148 n.4 (citing *Rowley*, 458 U.S. at 206-07).

all procedural violations of the IDEA entitle a litigant to compensatory relief.[33] The procedural violation must rise to a level that causes substantive harm to the child or his parents, deprive an eligible student of an IEP, or result in the loss of an education opportunity.[34] "In sum, then, the courts inquire whether the violation resulted in the denial of a FAPE."[35] The party claiming a deficiency with the school district's efforts bears the burden of proof.[36]

### A. Alleged Procedural Violations Requirements

The court first considers whether the hearing officer's decision that plaintiff failed to show procedural violations of the IDEA was supported by a preponderance of the evidence and then turns to the alleged substantive violations of the IDEA. The IDEA imposes extensive procedural requirements upon states receiving federal funding. Implicit in opinions addressing claimed procedural violations of the IDEA is the requirement that a parent be able to point to a provision of the law and provide facts showing the violation.[37] However, plaintiff's brief to this court fails to point the court to specific provisions of the IDEA, Kansas statutes, or administrative regulations and outline how defendants violated these provisions. Rather, the brief contains multiple arguments apparently aimed at establishing multiple procedural violations, but the law plaintiff cites simply does not require what she contends is required.

---

[33] *See Sytsema v. Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008).

[34] *Id.* (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (3d Cir. 2001).

[35] *Id.*

[36] *Thompson*, 540 F.3d at 1148 (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) and *Johnson v. Indep. Sch. Dist. No. 4 of Bixby*, 921 F.2d 1022, 1026 (10th Cir. 1990)).

[37] *See, e.g., Garcia v. Bd. of Educ. Of Albuquerque*, 520 F.3d 1116, 1125 (10th Cir. 2008) (describing the first step of review of an IDEA case as inquiring whether "the school district has complied with the procedures set forth in the IDEA"); *Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996) ("We begin our review by asking whether the State complied with IDEA procedures, including whether the IEP conformed with the requirements of the Act.").

The hearing officer found that defendants did not commit procedural violations by failing to administer tests to C.H. that were designed specifically for students with autism and by failing to staff the IEP team with educational professionals who had autism-specific training or by providing an autism specialist or consultant to aid in the development of the IEPs. The hearing officer also found that C.H.'s mother participated in the development of C.H.'s IEPs, and therefore defendants did not commit a procedural violation by denying her a meaningful opportunity to participate. As to the first two alleged violations, plaintiff simply fails to point to any applicable law requiring what she argues amount to procedural violations. As to the third alleged violation, the facts do not show that C.H.'s mother was denied an opportunity to meaningfully participate in the development of her son's IEPs. For reasons explained in more detail below, the court's own review of the record supports the hearing officer's conclusion that plaintiff failed to show defendants committed procedural violations.

The hearing officer made a finding that the appropriate individuals were present at the IEP meetings and that the IEPs contained the necessary elements required under federal and state regulations.[38] The hearing officer devoted a substantial portion of his decision to the finding that defendants provided C.H. with an appropriate "reevaluation." 20 U.S.C. § 1414(a)(1) requires that State or local educational agencies conduct an initial evaluation of students such as C.H. to determine whether the student is a child with a disability and to determine the educational needs of the student.[39] 20 U.S.C. § 1414(a)(2) requires the educational agency to complete a "reevaluation"

[38] Notice of Hearing Officer's Decision at p. 27 (citing 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.340-300.347; K.A.R. § 91-12-41(f)(1) and finding that the appropriate individuals were present at C.H.'s IEP meetings and that the IEP contained the required elements under federal and state regulations).

[39] 20 U.S.C. § 1414(a)(1)(C).

of a qualifying child at least once every three years unless the parent and the educational agency agree that reevaluation is unnecessary.[40] The reevaluation provision provides that reevaluation shall be conducted in accordance with subsection (b), which provides that, in "conducting the evaluation, the local agency shall . . . use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent[.]"[41] The statute goes on to require that the educational agency shall not "use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child[,]"[42] but shall instead utilize "technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."[43]

The plaintiff argued before the hearing officer that federal regulations provided additional requirements for reevaluation—that defendants should have administered tests to C.H. that were designed specifically for students with autism. However, the hearing officer found that defendants complied with 34 C.F.R. §300.305. This regulation provides that the IEP team and other qualified individuals, as appropriate, shall complete a reevaluation that consists of reviewing existing evaluation data on the student including, "evaluations and information provided by the parents of the child," "current classroom-based, local, or State assessments, and classroom-based observations" as well as "observations by teachers and related service providers[.]"[44] During the 2004-2005 IEP meeting, the team completed the three-year reevaluation. Testimony before the hearing officer

[40] 20 U.S.C. § 1414(a)(2).

[41] 20 U.S.C. § 1414(b)(2)(A).

[42] 20 U.S.C. § 1414(b)(2)(B).

[43] 20 U.S.C. § 1414(b)(2)(C).

[44] *See also* 20 U.S.C. § 1414(a)(2)(c) (requiring the same components for the reevaluation).

shows that the team considered teacher observations, therapist observations, parent input, and test results. The hearing officer found the information considered was sufficient to meet the requirements of IDEA's provisions concerning reevaluation, a conclusion supported by a preponderance of the evidence.

The plaintiff also argued before the hearing officer that at least one person with expertise in autism should be involved in the development of an IEP for a child with autism. She contends that IEP team members lacked sufficient training in autism to formulate an appropriate education plan for a student with autism. Again, none of the provisions of the Act or applicable state or federal regulations that plaintiff cites mandate that a person on the IEP team have expertise with a student's particular disability.[45] 20 U.S.C. § 1414(d)(B)(iv)(I) does require that a representative of the local agency who "is qualified to provide, or supervise the provision of, specifically designed instruction to meet the unique needs of children with disabilities" serve on the IEP team. However, this provision facially does not require that this individual have a specialization with a particular disability. Furthermore, the record shows that some team members did have varying levels of training in autism or in related areas. For example, C.H.'s principal testified that the school had two in-service training sessions focused on autism while C.H. was a student at Admire Grade School, and at least two IEP team members attended at least one of these training sessions. One of C.H.'s special education teachers held a bachelor's degree in education and a master's degree in special education. C.H.'s speech and language pathologist had previous experience working with autistic

[45] *See, e.g., Johnson v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 316 F. Supp. 2d 960, 970 (D. Kan. 2003) (finding that it was not a procedural violation for a specific general education teacher whom the parents contended was the only individual capable of integrating the student's home and school programs because "[n]either federal nor Kansas law require [her] presence.").

children.

Certainly, it would be preferable for an individual with extensive experience with a student's particular disability to take part in formulating that student's IEP, but the IDEA simply does not require this much. Like the plaintiffs in *Ellenburg v. New Mexico Military Institute*, the plaintiff in this case reads the IDEA too broadly. In *Ellenburg*, the Tenth Circuit emphasized that the IDEA is a spending statute imposing certain obligations on the states in exchange for federal funds, and therefore, "when Congress attaches conditions to a State's acceptance of federal funds[,] . . . the conditions must be set out 'unambiguously'" so states may be able to knowingly accept the conditions that come with federal funding.[46] Indeed, the regulations and statutory provisions plaintiff cites are a far cry from an unambiguous mandate that school districts administer testing specific to a student's disability or staff an IEP team with educational professionals who have a specialization with a student's particular disability. To that end, the court affirms the finding that plaintiff failed to prove defendants violated the IDEA by not administering appropriate tests to C.H. and by failing to include on the IEP team an educational professional with specialized training in autism.

Finally, the court affirms the hearing officer's finding that plaintiff failed to prove she was not provided an adequate opportunity to participate in the development of the IEPs. The IDEA contains several provisions aimed at providing parents of students with disabilities an opportunity to have significant involvement in educational decisions involving their children.[47] The record

---

[46] *Ellenburg v. New Mexico Military Inst.*, 478 F.3d 1262, 1274-75 (10th Cir. 2007) (quoting *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)).

[47] *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 925 (10th Cir. 1995); *see, e.g.*, 20 U.S.C. §§ 1414(a)(1)(D), (b)(1), (d)(1)(B)(I)(i) (providing for parental involvement).

shows C.H.'s mother participated in the development of his IEPs. She attended IEP team meetings and had a voice in the formulation of the IEPs. In fact, the principal testified that the IEP team was reconvened in 2006 to address C.H.'s mother's concerns regarding his curriculum. Although the record shows C.H.'s mother did not always agree with the IEP team's decisions, disagreement among IEP team members does not amount to a procedural violation. To the extent plaintiff believes she was denied the opportunity to participate because defendants did not perform testing specific to autism and because IEP members lacked sufficient training in autism, this argument fails. Again, plaintiff cannot point to any procedural requirement that school districts perform this type of testing or train the IEP team so as to provide a parent with a more meaningful opportunity to participate in the development of her son's IEP. Accordingly, the court affirms the hearing officer's finding that plaintiff failed to establish that she lacked a meaningful opportunity to participate in the development of C.H.'s IEPs. Having determined that the administrative officers correctly decided that plaintiff failed to establish procedural violations of the IDEA, the court next turns to alleged substantive violations.

**B. Alleged Substantive Violations of the IDEA**

The Act defines a FAPE as:

> special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program

required under section 1414(d) of this title.[48]

In determining whether the school district provided the student with a FAPE, the court must consider whether the relevant IEP was "reasonably calculated to enable [the student] to receive educational benefits."[49] "If the IEP was so calculated, the school district can be said to have provided a FAPE; if not, then not."[50] The Supreme Court has explained this is not an onerous standard: "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make . . . access meaningful . . . [T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."[51] The Tenth Circuit has concluded "that the educational benefit mandated by IDEA must merely be 'more than *de minimis*.'"[52] Therefore, the proper inquiry is not whether the IEP guarantees an educational benefit but whether it is reasonably calculated to do so.[53]

Despite numerous recent Tenth Circuit opinions relying on the United States Supreme Court's opinion in *Board of Education v. Rowley*,[54] plaintiff argues that *Rowley* is no longer good law and that the hearing officer erred in applying *Rowley*'s definition of a FAPE. Plaintiff seeks to

---

[48] 20 U.S.C. § 1401(9).

[49] *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1148-49 (10th Cir. 2008) (quoting *Rowley*, 458 U.S. at 207)).

[50] *Id.* at 1149.

[51] *Rowley*, 458 U.S. at 192.

[52] *Thompson*, 540 F.3d at 1149 (quoting *Urban ex rel. Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996)).

[53] *Id.*

[54] *See, e.g.*, *Miller ex rel S.M. v. Board of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1243 n.6, 1244 (10th Cir. 2009); *Thompson*, 540 F.3d at 1148, 1149, 1151; *Sytsema v. Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1313, 1312-1313, 1315, 1317-18 (10th Cir. 2008).

have the correct standard of an "appropriate" education applied to the evidence and arguments presented to the hearing officer, which she contends would compel a finding that plaintiff satisfied her burden of showing substantive violations of the IDEA.

*Rowley* is a 1982 Supreme Court opinion considering what educational standards are required under the Education of the Handicapped Act (EHA), the predecessor statute to the IDEA. The opinion establishes the framework that is used today for review of cases brought under the IDEA. The Tenth Circuit still relies on *Rowley*'s standard that a student is provided a FAPE when the IEP is "reasonably calculated to enable [the student] to receive educational benefits."[55] Therefore, the Tenth Circuit has concluded that the IEP must be sufficient to confer *some* educational benefit.[56] Plaintiff contends that the appropriate standard is whether the IEP was appropriately designed and implemented so as to confer a *meaningful* benefit. She cites several cases from other circuits in support of her argument.

It is important to understand what plaintiff is not arguing. Plaintiff is not arguing in favor of a modification to the current standard. That is, plaintiff does not concede that the hearing officer correctly applied the "some benefit" standard but that a change in interpretation of the IDEA is warranted. Instead, she argues the hearing officer applied an incorrect standard. Such an argument is borderline frivolous, as plaintiff apparently ignores the fact that the Tenth Circuit has consistently applied the "some benefit" standard.[57] Furthermore, the Tenth Circuit has expressly addressed the fact that it does not apply the "meaningful benefit" standard, impliedly rejecting the two of the very

---

[55] *Thompson*, 540 F.3d at 1148-49 (quoting *Rowley*, 458 U.S. at 207)).

[56] *Sytsema*, 538 F.3d at 1313 ("[W]e apply the "some benefit" standard the Supreme Court adopted in *Rowley*.").

[57] *See supra* note 54.

cases upon which plaintiff relies:

> [Plaintiffs] contend that the relevant standard requires a "meaningful benefit" whereby the student achieves "significant learning." In support of their argument, they cite *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir. 1988). In *Polk*, the Third Circuit carefully analyzed the Act as well as the language in *Rowley* and held that the relevant standard should be characterized as a "meaningful benefit." *Id.* at 184; *see also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004).
>
> Admittedly, it is difficult to distinguish between the requirements of "some benefit" and the "meaningful benefit" standards. We have applied the "some benefit" standard, and thus evaluate the case at bar with that standard in mind.[58]

Accordingly, the court finds the hearing officer applied the correct standard for evaluating alleged substantive violations of the IDEA, and this argument in favor of reversal is without merit. The court also affirms the hearing officer's finding that plaintiff failed to show a substantive violation of the IDEA. Plaintiff argued defendants denied C.H. a FAPE because (1) they failed to include appropriate modifications to C.H.'s IEP to ensure C.H. had the opportunity to achieve at grade level in those areas which defendants admit C.H. had the ability to do so; (2) they failed to include in the IEPs the measurable goals other than those measuring functional skills; (3) progress reports were based on observation rather than a compilation of data, and they failed to include any information about academic progress; (4) C.H.'s curriculum had no discernable connection to Kansas state curriculum; (5) defendants failed to provide appropriate services in response to an independent evaluation of C.H. showing sensory integration problems; (6) defendants required C.H. to write things over and over in an attempt to help improve his memory even though this is not a scientifically proven method of teaching autistic children; (7) modifications to C.H.'s curriculum

---

[58] *Sytsema*, 583 F.3d at 1313 n.7.

did not occur in a meaningful manner; (8) defendants failed to create an "IEP at a Glance," which the cooperative used to assist regular education teachers with the modification of a curriculum. Plaintiff contends that these deficiencies show "[d]efendants failed to provide C.H. meaningful educational benefit such that he could progress in the regular education classroom to the extent he is able."[59]

Assuming *arguendo* that defendants failed to provide the maximum educational benefits to C.H., he still made measurable progress under the IEPs in place. For example, his progress reports show C.H. made advancements toward meeting many of his IEP goals. The progress reports were based mostly on observation rather than a compilation of data. Nevertheless, the progress reports still show marked improvement. Additionally, C.H. showed improvement on various tests administered during the years in question. Observations from educators also showed that C.H. was making advancements with functional goals and with social interaction. Plaintiff contends C.H.'s IEPs focused too much on functional goals rather than academic goals more in line with a standard classroom curriculum. However, testimony from C.H.'s former principal shows that C.H.'s mother was concerned with helping C.H. develop his functional skills and that educational officials attempted to address her concerns by incorporating her suggestions into the IEPs. Although defendants did not provide the sensory integration services C.H.'s mother requested in response to C.H's aversion to certain foods, defendants did work with C.H. on serving one of his non-preferred food items to others in the cafeteria. In short, C.H. showed progress under the IEPs.

Plaintiff's arguments that defendants failed to provide a FAPE amount to concerns about

[59] Plaintiff's Motion for Judgment on the Pleadings and Suggestions in Support (Doc. 14) at 13. Notably, plaintiff's post-trial brief to the hearing officer contends these circumstances resulted in the denial of a FAPE. She does not explicitly raise an argument that C.H. was not placed in the least restrictive environment, and the hearing officer did not address this issue. Plaintiff also did not raise this issue as an error in her brief to this court.

appropriate methodology and at best show the school district perhaps could have better served C.H. in some areas. However, the Tenth Circuit has echoed the Supreme Court's warning that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," and therefore, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the states."[60] Indeed, it is not this court's role to determine whether C.H. could have made more progress when provided with different services. Although it is understandable that parents would advocate for their children to receive services best calculated to produce maximum benefits, this is simply not the standard this court applies when addressing alleged violations of the Act. For these reasons, the court affirms the hearing officer's finding that C.H.'s IEPs were reasonably calculated to enable C.H. to receive educational benefits and that C.H. did indeed receive some educational benefits from the IEPs.

Plaintiff has failed to show defendants violated the IDEA. Accordingly, plaintiff is not entitled to reimbursement of private school tuition, and the court need not address whether the Boston Higashi School was an appropriate placement for C.H. For the foregoing reasons, the court affirms the decisions of the administrative officers and grants defendants' cross-motion for judgment on the administrative record.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Judgment on the Pleadings and Suggestions in Support (Doc. 14) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendants' Memorandum in Opposition to Plaintiffs' Motion for Default Judgment on the Pleadings and Cross-Motion for Judgment on the

[60] *Sytsema*, 538 F.3d at 1318 (quoting *Rowley*, 458 U.S. at 208).

Administrative Record (Doc. 16) is hereby GRANTED

**IT IS SO ORDERED.**

Dated this 30th day of September, 2009, at Topeka, Kansas.

s/ K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge